UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
GOVINDLAL K. BHANUSALI, M.D., and GOVINDLAL
BHANUSALI, MD, PC,

                                        Plaintiffs,

                    - against -

ORANGE REGIONAL MEDICAL CENTER, *et al.*,

                                        Defendants.
-------------------------------------------------------------------x

**OPINION AND ORDER**

No. 10-CV-6694 (CS)

Appearances:
Bryan McCaffrey
Seth Marcus
Leffler Marcus & McCaffrey LLC
New York, New York
*Counsel for Plaintiffs*

Douglas P. Catalano
Neil G. Sparber
Fulbright & Jaworski L.L.P.
New York, New York
*Counsel for ORMC Defendants*[1]

Michelle E. Phillips
Michael L. Abitabilo
Jackson Lewis LLP
White Plains, New York
*Counsel for CRHC Defendants*[2]

Seibel, J.

        Before the Court are two Motions to Dismiss Plaintiffs' Third Amended Complaint

("TAC"), (Doc. 58):  the ORMC Defendants' Motion to Dismiss, (Doc. 65), and the CRHC

---

[1] "ORMC Defendants" refers to the following Defendants:  Orange Regional Medical Center ("ORMC"); Board of Directors of the ORMC; Lou Heimbach, M.D.; Scott Batulis; Gerard J. Galarneau, M.D.; and James E. Oxley, D.O.

[2] "CRHC Defendants" refers to the following Defendants:  Crystal Run Healthcare LLP ("CRHC"); Hal D. Teitelbaum, M.D.; Christopher Inzerillo, M.D.; Gregory Spencer, M.D.; and Kevin Trapp, M.D.

Defendants' Motion to Dismiss, (Doc. 68).  For the reasons set forth below, both Motions are GRANTED.

# I.  **BACKGROUND**

I previously addressed and granted the ORMC Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint ("FAC"), (Doc. 25), in a Decision and Order dated January 20, 2012. (Doc. 46.)  Familiarity with that Decision, which sets forth a substantial portion of the factual background of this case, is presumed.  I will describe here in detail only those new allegations relevant to the instant Motions.  On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), I accept as true the facts, but not the conclusions, as set forth in the TAC, the operative pleading.

## A.  *Discrimination Allegations*

Plaintiffs' discrimination allegations center on an alleged "Sham Peer Review," (TAC ¶ 74), at ORMC to which Dr. Bhanusali was subject and which led to a precautionary suspension of and restrictions on his ORMC privileges, thereby "render[ing] it economically and professionally impossible to perform his duties as an orthopedic surgeon."  (*Id.* ¶ 118; *see id.* ¶¶ 79-117.)  Plaintiffs allege that the Sham Peer Review represented intentional discrimination against Dr. Bhanusali on the basis of his race (Indian), national origin (India), and age (62 years old), in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, as well as the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296.  Plaintiffs also allege that the Defendants conspired to violate Dr. Bhanusali's civil rights by perpetrating the Sham Peer Review in violation of 42 U.S.C. § 1985.

I previously dismissed all of Plaintiffs' discrimination claims against the ORMC Defendants because I found that Plaintiffs failed to allege facts sufficient to render plausible the inference that the ORMC Defendants intentionally discriminated against Plaintiff.[3]  (*See* Doc. 46, at 14-15.)  I gave Plaintiffs leave to amend their discrimination claims, with the following guidance:

> [A]ny [amended complaint] would have to include specifics (not simply information and belief, or conclusory allegations) regarding others similarly situated who were more favorably treated, sufficient to show both that the others' conduct was similar to [Dr. Bhanusali's] and that they were subjected to less exacting scrutiny, which would render plausible an inference of discrimination.

(*Id.* at 22.)[4]

As they did in the FAC, (*see* FAC ¶¶ 75-120), Plaintiffs in the TAC describe in some detail the series of committee meetings and case reviews that led to the restrictions on Dr. Bhanusali's privileges of which Plaintiffs now complain, (*see* TAC ¶¶ 79-124).  First was a May 6, 2009 meeting of the Physicians Excellence Committee ("PEC"), attended by a number of the Defendant-doctors, concerning "a patient from months earlier who had had a total knee replacement surgery."[5]  (*Id.* ¶ 87, 89, 95.)  The PEC meeting led to the requirement that Dr. Bhanusali "be assisted on a list of specified surgeries thereby limit[ing] his surgical privileges."

---

[3] The CRHC Defendants had answered at the time, and thus did not move to dismiss Plaintiffs' FAC.  In dismissing the FAC as against the ORMC Defendants, I advised the CRHC Defendants that my reasoning seemed to apply equally to them, and gave them the opportunity to submit a letter motion stating their position with respect to whether my Decision should apply to them.  (Doc. 46, at 23.)  They did so on February 8, 2012, seeking dismissal of all claims against the CRHC Defendants.  (Doc. 48.)  Before I ruled on the CRHC Defendants' letter motion, Plaintiffs filed a Second Amended Complaint ("SAC") on February 28, 2012.  (Doc. 50.)  Both sets of Defendants sought leave to move to dismiss the SAC.  (Docs. 52, 54.)  At a pre-motion conference on April 5, 2012, I granted Plaintiffs leave to file a TAC, which they did on May 7, 2012.  (Doc. 58.)  The instant Motions followed.

[4] I also gave Plaintiffs leave to amend their dismissed retaliation claim, (Doc. 46, at 22,) but Plaintiffs did not avail themselves of this opportunity.

[5] The TAC does not set forth the relevant circumstances of this knee replacement surgery – that is, whether there were any complications, complaints, or other issues associated with the surgery – nor does it set forth the patient outcome.

(*Id.* ¶ 92.)  On May 28, 2009, following a meeting with some of the Defendant-doctors, Dr.

Bhanusali was further informed that, prior to booking one of these list-specified surgeries, he

would have to present the cases to the Chair or Vice Chair of Orthopedics, who would have the

right to proctor the surgery.  (*Id.* ¶ 97.)  On October 6, 2009, the day after another meeting,[6] Dr.

Bhanusali received a letter informing him that his clinical privileges were immediately and

precautionarily suspended.  (*Id.* ¶ 99; *see id.* ¶ 100.)

On the same day, there was a meeting of the Medical Executive Committee ("MEC")

confirming Dr. Bhanusali's precautionary suspension and establishing an Ad Hoc Committee to

review six of his surgeries from as early as March 25, 2008 to as late as September 29, 2009.

(*Id.* ¶¶ 100, 102, 104.)  According to Plaintiffs, "[t]wo of these cases involved broken drill bits,"

which "are not an unusual occurrence in orthopedic surgery," and "[i]n neither case did the

patient suffer any adverse consequences."  (*Id.* ¶ 106.)  The September 29, 2009 case – Plaintiffs

do not say whether this was one of the two surgeries that involved broken drill bits – "involved

an indigent patient who had been refused treatment by another ORMC staff surgeon because he

lacked insurance."  (*Id.* ¶ 107.)  As to the rest, Plaintiffs only allege that "[i]n none of the cases

reviewed was there evidence of a patient having an unsatisfactory outcome," and "[i]n none of

the cases reviewed had there been any patient complaint regarding Dr. Bhanusali's care."  (*Id.* ¶¶

108-09; *see id.* ¶ 125 ("In none of the six cases that formed the basis of Dr. Bhanusali's peer

review was there a report of a patient suffering a negative outcome, suing the hospital or

otherwise complaining about the care they received by Dr. Bhanusali to ORMC.").)[7]  Plaintiffs

otherwise allege no facts regarding the six cases that were the subject of the review.  Although

---

[6] The TAC identifies neither who was at this meeting nor its subject.

[7] It is entirely unclear what Plaintiffs mean by "an unsatisfactory outcome" or "a negative outcome."  These phrases could mean that everything went smoothly, or that things went very wrong but ultimately the patient fully recovered, or something in between.

the Ad Hoc Committee recommended that the precautionary suspension be lifted (with certain limitations on Dr. Bhanusali's privileges remaining), the MEC recommended revocation of all privileges as well as membership on the medical staff.  (*Id.* ¶¶ 110-11.)

Following an appeal of the MEC's decision pursuant to ORMC bylaws, a second Ad Hoc Committee was formed.  (*Id.* ¶ 113.)  After several hearings and testimony, this committee recommended against full revocation of privileges and in favor of continued privileges subject to severe restrictions.  (*Id.* ¶¶ 115-16.)  Apparently, the MEC adopted in full the recommendations of the second Ad Hoc Committee, and these recommendations were then adopted by the Executive Committee of ORMC on behalf of the Board of Directors.  (*See id.* ¶ 117.)

The TAC includes numerous allegations regarding ostensibly similarly-situated comparators – that is, younger or white physicians alleged to have committed as or more serious medical transgressions that went without investigation and/or did not lead to any adverse action – in an attempt to render plausible the inference that the temporary suspension of and restrictions on Dr. Bhanusali's privileges were because of his race, national origin, or age.  (*See* TAC ¶¶ 126-45.)  Plaintiffs generally allege that conduct by "younger and/or white physicians" that has resulted in "lawsuits against ORMC," "mortality and/or morbidity to patients," or "ORMC being the subject of negative press coverage," or that has "posed far greater danger to the quality of care provided patients," has gone without peer review or other forms of discipline.  (*Id.* ¶¶ 127-31.)  Where Plaintiffs allege specifics, they allege the type of doctor, the nature of the procedure, the negative outcome, and that there was no inquiry, peer review, or discipline following the incident.  (*Id.* ¶¶ 133-40, 142-43.)[8]  Only one of these alleged comparators was involved in more

---

[8] Plaintiffs also allege an incident involving a "white non-Asian OB/GYN physician [who] had come in drunk to the OB/GYN Department," an incident involving a "younger white non-Asian physician [who] was caught having sexual intercourse with a nurse in the ICU," and the generally negative press coverage of Michael Kamalian, a white

than one incident.  (*See id.* ¶¶ 136-37 ("white younger urologist" performed unnecessary "total nephrectomy" on one patient, and, on another patient, "performed a cystoscopy and stent introduction . . . on the wrong ureter").)  For the remaining comparators, Plaintiffs allege only one incident each.  (*See id.* ¶¶ 133-35, 138-40.)  Plaintiffs do not allege the approximate dates of any of these comparator incidents.

Plaintiffs have also added allegations regarding other Indian doctors against whom Defendants allegedly discriminated.  Specifically, some of Dr. Polepalle's cases "in which patients had experienced complications not uncommonly experienced by patients at ORMC treated by white physicians" were selected for review by an outside physician in 2007.  (*Id.* ¶¶ 146-48.)  According to Plaintiffs, Dr. Polepalle's review, to which "none of those similarly situated white physicians were [*sic*] subjected," was flawed because it was based only on hospital records and did not also consider Dr. Polepalle's private practice records.  (*Id.* ¶ 147-48.)  Furthermore, the review was conducted without notice to Dr. Polepalle.  (*Id.* ¶ 149.)  The review terminated upon Dr. Polepalle's voluntary surrender of his ORMC privileges after being fired from CRHC.  (*Id.* ¶ 150.)  Plaintiffs also identify Dr. Jhaveri, who in 2000-01 complained to the Chief of the Medical Staff about a white emergency room physician's treatment of a patient.  (*Id.* ¶ 153.)  Rather than investigate the incident himself or refer it to the PEC or MEC, the Chief reprimanded Dr. Jhaveri, and allegedly treated him "with contempt" in doing so.  (*Id.* ¶¶ 154-55.)

### B.  *Antitrust Allegations*

Plaintiffs separately allege that the Sham Peer Review represented concerted action in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 340 of

---

physician apparently named by certain publications in 2000 and 2002 as a "dangerous doctor."  (TAC ¶¶ 141, 144-45.)

New York General Business Law.  I previously dismissed Plaintiffs' antitrust claims without prejudice under the doctrine of primary jurisdiction, because the Public Health and Health Planning Council of the New York State Department of Public Health ("PHHPC")[9] – which is charged with reviewing challenges to a hospital's curtailment of a physician's privileges, *see* N.Y. Pub. Health Law § 2801-b – had not rendered its determination regarding the curtailment of Dr. Bhanusali's privileges, and because whether there was a proper medical reason for doing so (a question the PHHPC was to address) would be dispositive of his antitrust claims.  (*See* Doc. 46, at 12 (citing *Johnson v. Nyack Hosp.*, 964 F.2d 116, 121 (2d Cir. 1992)).)  Because the PHHPC made its ruling on March 2, 2012, (TAC ¶ 191),[10] the doctrine of primary jurisdiction no longer presents a bar to consideration of the merits of Plaintiffs' antitrust claims.

Like their discrimination claims, Plaintiffs' antitrust claims are premised on a conspiracy to utilize the Sham Peer Review to drive Dr. Bhanusali out of the market by "render[ing] it economically and professionally impossible [for him] to perform his duties as an orthopedic surgeon."  (*Id.* ¶ 118; *see id.* ¶¶ 234-36.)  They allege that Defendants "conspired to eliminate Dr. Bhanusali as a competitor for the provision of orthopedic surgical services in the [r]elevant [m]arket" – namely, the "service market to patients of orthopedic surgery and related subsidiary medical treatments" in "Orange County New York and the surrounding areas which include parts of Northern New Jersey and Eastern Pennsylvania," (*id.* ¶¶ 53-54) – "by terminating his surgical

---

[9] The PHHPC was formed on December 1, 2010 upon the consolidation of the Public Health Council ("PHC") with the State Hospital Review and Planning Council.  *See* N.Y. State Dep't of Health, *Public Health Council*, http://www.health.ny.gov/facilities/public_health_council/ (last visited Aug. 6, 2013).  Its duties with respect to Section 2801-b remain the same as those of the PHC.

[10] In its March 2, 2012 letter to Dr. Bhanusali, the PHHPC indicated that at its February 2, 2012 meeting, it had "determined that ORMC's reasons for imposing these restriction [*sic*] were focused on standards of patient care and welfare and, therefore, consistent with [Section] 2801-b.  The Council voted not to credit [Dr. Bhanusali's] complaint."  (Affidavit of Samantha Beltre ("Beltre Aff."), (Doc. 66), Ex. A.)  I can consider the content of the PHHPC's March 2, 2012 letter (not for its truth but for the fact of what was said) because it is both directly referenced in, (TAC ¶ 191), and "integral" to, the TAC.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

privileges at ORMC." (*Id.* ¶ 233.)  In support of the allegations of conspiracy, Plaintiffs point to facts they allege show the "[c]losely [i]ntertwined [r]elationship [b]etween ORMC and [CRHC]." (*Id.* at 12 (heading).)  For example, Plaintiffs allege that "a significant percentage of the physicians with medical staff privileges at ORMC are employees of, partners of, or otherwise affiliated with [CRHC]." (*Id.* ¶ 65.)  Some of those CRHC employees have "supervisory responsibility" at ORMC.  (*Id.* ¶ 68.)  Plaintiffs allege on information and belief that CRHC contributed over one million dollars to ORMC for new buildings, and that the two entities have entered into other joint ventures or partnerships.  (*Id.* ¶ 71.)  Plaintiffs allege, also on information and belief, that Defendant-Teitelbaum, the Chairman and CEO of CRHC, "has informed other physicians at ORMC that they will not be able to practice at ORMC or anywhere in Orange County unless those practitioners join[] or bec[o]me otherwise affiliated with [CRHC]." (*Id.* ¶ 72.)

Plaintiffs allege that the conspiracy to drive Dr. Bhanusali out of the market caused the following harmful effects on competition:

> a) Limit[ing] patient choice in the provision of orthopedic surgical services including providers willing to provide such services to indigent patients lacking insurance;

> b) Limiting the quality of care available to Dr. Bhanusali's patients, with whom he has established a relationship of trust and familiarity with their conditions, having an adverse emotional impact on those patients forced to change physicians[;]

> c) Limiting the quality of care by preventing other physicians with whom Dr. Bhanusali through years of practice has established a trust relationship, from referring patients to Dr. Bhanusali[;]

> d) Driving up the price for orthopedic surgical procedures by eliminating a competitor from the market place including forcing the closure of the ORMC orthopedic clinic operated by Dr. Bhanusali; [and]

8

> e) [Causing] [a]n overall chilling on competition from other potential competitors in the market for fear of retaliation through [the] Sham Peer Review.

(*Id.* ¶ 237 (emphases omitted); *see also id.* ¶¶ 238-39 (competition harmed by "transforming [the relevant market] from a free and open market to one closed to free and fair competition," because "[a]ll consumers suffer when markets cease to be free").)

## II.  DISCUSSION

### A.  *Motion to Dismiss Standard*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief."  *Id.* at 679.  Deciding whether a complaint states a plausible claim for relief is "a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense." *Id.*

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to

relief.'" *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

B. *Discrimination Claims*

While it remains true that "a complaint in an employment discrimination lawsuit [need

not] contain specific facts establishing a *prima facie* case of discrimination under the

[*McDonnell Douglas*] framework," *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002); *see*

*Twombly*, 550 U.S. at 569-70 (plausibility standard not inconsistent with *Swierkiewicz*), the

complaint must nevertheless, at a minimum, "meet the standard of pleading set forth in *Twombly*

and *Iqbal*," *Hedges v. Town of Madison*, 456 F. App'x 22, 23 (2d Cir. 2012) (summary order).

Thus, Plaintiffs must plead "enough facts to state a claim for relief that is plausible on its face."

*Twombly*, 550 U.S. at 570.  To be entitled to relief in this case, whether under Section 1981, Title

VII, the ADEA, or the NYSHRL, Plaintiffs would ultimately have to prove by a preponderance

of the evidence that Dr. Bhanusali was discriminated against on the basis of his race, national

origin, or age.  Whether Plaintiffs have plausibly alleged a *prima facie* case is an important tool

at the motion to dismiss stage to assess the ultimate plausibility of Plaintiffs' claim for relief, *see,*

*e.g.*, *Trachtenberg v. Dep't of Educ. of N.Y.*, No. 12-CV-7964, 2013 WL 1335651, at *3

(S.D.N.Y. Apr. 3, 2013) (collecting cases), and to that end, I look to whether Plaintiffs have

alleged facts that would plausibly support an inference of discrimination, *see id.* at *7-9.[11]

That the individuals involved in the "Sham Peer Review" were white and/or younger

does not give rise to such an inference.  *See Johnson v. City of N.Y.*, 669 F. Supp. 2d 444, 450

---

[11] The elements of a *prima facie* case of discrimination are essentially the same whether the claim is brought under Section 1981, Title VII, the ADEA, or the NYSHRL.  *See Gertskis v. EEOC*, No. 11-CV-5830, 2013 WL 1148924, at *8 (S.D.N.Y. Mar. 20, 2013) (collecting cases).

(S.D.N.Y. 2009) ("The mere fact that plaintiff and defendants are of different races, standing alone, is simply insufficient as a factual pleading to allege racially motivated discrimination for purposes of a plausible [S]ection 1981 claim."); *see also Stephens-Buie v. Shinseki*, No. 09-CV-2397, 2011 WL 2574396, at *5 (S.D.N.Y. June 27, 2011) ("mere fact" that plaintiff's race or national origin differed from those who caused her alleged adverse employment action insufficient to raise an inference of discriminatory intent); *Lee v. Sony BMG Music Entm't, Inc.*, No. 07-CV-6733, 2010 WL 743948, at *12 (S.D.N.Y. Mar. 3, 2010) ("The mere fact that the two employees involved in an incident were of different races does not give rise to an inference of racism . . . .").

To support an inference of discrimination based on allegations of disparate treatment, a plaintiff must plausibly allege the existence of at least one comparator who was more favorably treated despite being "similarly situated to the plaintiff in all material respects," meaning "(1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493-94 (2d Cir. 2010) (internal quotation marks omitted). Plaintiffs' general allegations that misconduct by "younger and/or white physicians" went without peer review or discipline, (TAC ¶¶ 127-31), are wholly conclusory, do not specify the individuals involved or the nature of their alleged misconduct, and are thus insufficient to render plausible the inference of discriminatory intent. Where Plaintiffs do point to specific instances of alleged misconduct by white and/or younger comparators that did not lead to any peer review, investigation, or discipline at ORMC, (*id.* ¶¶ 133-45), and allege the type of doctor, the nature of the incident, and the negative patient outcome, they fail to plausibly allege that these comparators were similarly situated in all material respects to Dr.

Bhanusali.  They thus have not alleged facts sufficient to plausibly support an inference of discriminatory intent.

First, Plaintiffs have provided no information whatsoever about three (or four) of the six incidents that led to Dr. Bhanusali's discipline.  Without knowing what those incidents entailed, meaningful comparison is impossible.  Plaintiffs' decision to omit any specifics as to the surgeries that prompted Dr. Bhanusali's suspension and restrictions means that they cannot plausibly allege "'a reasonably close resemblance of facts and circumstances,'" *Trachtenberg*, 2013 WL 1335651, at *7 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)), or "an objectively identifiable basis for comparability," *Graham*, 230 F.3d at 40 (internal quotation marks omitted).

Second, for all but one of the alleged comparators, Plaintiffs allege only one incident of medical misconduct, (TAC ¶¶ 135, 138-43); for the remaining comparator, Plaintiffs allege two, (*id.* ¶¶ 136-37).  By contrast, the investigation of Dr. Bhanusali focused on *six* surgeries.  (*Id.* ¶ 104.)  Although Plaintiffs note that two of them involved broken drill bits, they allege no specific facts regarding the other surgeries, other than alleging in a conclusory fashion that none of the six led to "unsatisfactory outcomes" or "patient complaint[s]."  (*Id.* ¶¶ 108-09.)  But the mere fact that Dr. Bhanusali was considered for discipline only after six incidents (whatever they were) meaningfully distinguishes his situation from the comparators, who escaped such scrutiny but were only involved in a single incident (or in one case, two incidents).  And, as noted, absent factual allegations regarding the nature of three (or four) of the surgeries that were the subject of the investigation of Dr. Bhanusali, and the nature of their outcome (beyond the ultimate outcome generally not being "unsatisfactory," whatever that means), the Court is without enough facts to

conclude that Plaintiffs have plausibly alleged an inference of discriminatory intent based on disparate treatment of comparators similarly situated in all material respects.

Third, Plaintiffs have alleged no facts regarding the level of experience of the comparator-doctors relative to Dr. Bhanusali. If the comparators were significantly more or less experienced than Dr. Bhanusali, then they were not similarly situated to him in all material respects. *See, e.g.*, *Lawless v. TWC Media Solutions, Inc.*, 487 F. App'x 613, 616 (2d Cir. 2012) (summary order) (requiring "similar level of relevant experience" to be similarly situated); *Lawrence v. Mehlman*, 389 F. App'x 54, 57 (2d Cir. 2010) (summary order) (same); *Loucar v. Bos. Market Corp.*, 294 F. Supp. 2d 472, 479-80 (S.D.N.Y. 2003) (same).[12]

The allegations regarding the treatment of other Indian doctors is of no help. Those regarding the disparate treatment of Dr. Polepalle, (TAC ¶¶ 146-50), are even more conclusory than those regarding Dr. Bhanusali. For example, Plaintiffs fail to allege what kind of doctor he is, what procedures were under review, how many incidents occurred, or anything about the white physicians, such as what they may have done or how many times.[13] The allegations regarding the disparate treatment of Dr. Jhaveri, (*id.* ¶¶ 153-55), are not only wholly conclusory, but also remote in time to Dr. Bhanusali's alleged treatment. *See Hasemann v. United Parcel*

---

[12] Further, only one of these comparator-doctors is an orthopedic surgeon. Plaintiffs attempt to downplay the significance of this in their brief, (*see* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ("Ps' Mem."), (Doc. 71), 7 (arguing that requiring such similarity "is an absurd standard of pleading")), but the dissimilarity in circumstances undermines, at least to some extent, the plausibility of an inference of discriminatory intent. Comparing the conduct (or misconduct) of medical doctors in different fields is a bit like comparing apples and oranges, and the allegedly disparate treatment of them does little to support an inference of discrimination absent facts plausibly showing that they are subject to the "same performance evaluation and discipline standards" and were "engaged in comparable conduct." *Ruiz*, 609 F.3d at 493-94 (internal quotation marks omitted); *cf. Tassy v. Brunswick Hosp. Ctr., Inc.*, 296 F.3d 65, 75 (2d Cir. 2002) (Walker, J., dissenting) (recognizing that a "psychiatrist accused of abusive and harassing conduct" may not be similarly situated to "other physicians who have different specialties"); *Ghaly v. Simsarian*, No. 04-CV-1779, 2009 WL 801636, at *8 (D. Conn. Mar. 26, 2009) (psychiatrist not similarly situated to physician because "a psychiatrist's duties and functions at this mental health facility are not the same as a physician's duties and functions at the facility").

[13] Further, it is unclear why a hospital reviewing a doctor does anything wrong in confining its review to hospital records; Plaintiffs do not suggest what authority a hospital would have to also review records of that doctor's private practice, or why not doing so is suggestive of discrimination.

*Serv. of Am., Inc.*, No. 11-CV-554, 2013 WL 696424, at *7 (D. Conn. Feb. 26, 2013)

("Comments too remote in time and context cannot support an inference of discriminatory

intent.") (collecting cases); *Aiossa v. Bank of Am., N.A.*, No. 10-CV-1275, 2012 WL 4344183, at

*2 (E.D.N.Y. Sept. 21, 2012) (incidents "too far removed in time" insufficient to "raise an

inference of discrimination").  Neither set of allegations are sufficient to bolster the plausibility

of an inference of discriminatory intent in the treatment of Dr. Bhanusali.

In sum, while Plaintiffs have added allegations in the TAC that were absent from the

FAC, I cannot say from the TAC as a whole that Plaintiffs have plausibly alleged facts

supporting the inference that Dr. Bhanusali was discriminated against on the basis of his race,

national origin, or age.  Dr. Bhanusali is over sixty and of Indian race and origin, and he may

have been treated unfairly, but there are no facts rendering plausible the conclusion that he was

treated unfairly *because* of his age, race, or national origin.  Thus, Plaintiffs have not met their

burden to allege enough facts to "nudge[] their claims across the line from conceivable to

plausible." *Twombly*, 550 U.S. at 570.  Accordingly, Plaintiffs' claims under Section 1981 (First

Cause of Action), the ADEA (Second Cause of Action), the NYSHRL (Third Cause of Action),

and Title VII (Fourth Cause of Action), are hereby dismissed.  Furthermore, in the absence of

sufficiently plausible allegations of discriminatory intent, Plaintiffs' Section 1985 conspiracy

claim (Fifth Cause of Action) must also be dismissed.  *See Brown v. City of Oneonta, N.Y.*, 221

F.3d 329, 341 (2d Cir. 2000).

## C. Antritrust Claims

### 1. The PHHPC's Decision

Under New York law, "the [PHHPC's] findings are accorded only presumptive, not

conclusive, effect [in a subsequent court proceeding] in sensible recognition of the [PHHPC's]

special competence over medical care issues." *Gelbard v. Genesee Hosp.*, 87 N.Y.2d 691, 697

(1996); *accord Chandra v. Beth Israel Med. Ctr.*, No. 09-CV-6619, 2010 WL 5600373, at *4 (S.D.N.Y. Dec. 2, 2010), *adopted by* 2011 WL 180801 (S.D.N.Y. Jan. 19, 2011); *Mahmud v. Bon Secours Charity Health Sys.*, 289 F. Supp. 2d 466, 472 n.11 (S.D.N.Y. 2003).  I thus cannot dismiss Plaintiffs' antitrust claims based solely on the PHHPC's decision in favor of ORMC. The doctrine of primary jurisdiction simply recognizes that "[t]he medical expertise of the [PHHPC] will prove extremely helpful in sorting through [a doctor's] complex records, and resolving the factual questions at stake."  *Johnson*, 964 F.2d at 122.  It is thus not a matter of *deferring* to the PHHPC's decision so much as a matter of *waiting* for the PHHPC's decision. *See id.* at 122-23 (rationale behind primary jurisdiction supports district court waiting for PHHPC's decision "before [it] considers the issue" because "the [PHHPC] has the distinctive expertise to divine whether defendants had a legitimate medical reason for revoking [plaintiff's] privileges").  Here, although the resolution of the factual question whether Defendants had a legitimate medical reason for restricting Dr. Bhanusali's privileges could be dispositive with respect to Plaintiffs' antitrust claim, and although the PHHPC's views on that subject are accorded presumptive effect – and therefore it was appropriate for me to dismiss Plaintiffs' antitrust claims under the doctrine of primary jurisdiction prior to the PHHPC's decision, (*see* Doc. 46, at 12) – that the PHHPC has now denied Dr. Bhanusali's claim that ORMC was "arbitrary and capricious" in restricting his privileges, (Beltre Aff. Ex. A), is not itself a basis for granting Defendants' Motions to Dismiss.

     2.  <u>New York Antitrust Claim</u>

     Defendants correctly argue in their briefs that Plaintiffs cannot bring an antitrust claim under New York state law because Section 340 of New York General Business Law does not

apply to physicians.  (ORMC's Mem. 16; CRHC's Mem. 6-7.)[14]  *See Mahmud v. Kaufmann*

(*Mahmud I*), 496 F. Supp. 2d 266, 278 (S.D.N.Y. 2007) ("[I]t is well-established that [Section

340] does not apply to physicians."); *People v. Roth*, 52 N.Y.2d 440, 447 (1981) ("[T]he medical

profession is . . . insulated from liability under [Section 340].").  Plaintiffs do not argue

otherwise.  Accordingly, Plaintiffs' claim under Section 340 is dismissed.

### 3.  Federal Antitrust Claim

"It is a well-established principle that, while the United States is authorized to sue anyone

violating the federal antitrust laws, a private plaintiff must demonstrate 'standing.'"[15]  *Daniel v.*

*Am. Bd. of Emergency Med.*, 428 F.3d 408, 436 (2d Cir. 2005) (citing *Cargill, Inc. v. Monfort of*

*Colo., Inc.*, 479 U.S. 104, 110-11 & nn.5-6 (1986)).  The Second Circuit has identified four

factors relevant to determining whether a plaintiff has antitrust standing:  "an injury in fact (1) to

plaintiffs' business or property; (2) that is not remote from or duplicative of that sustained by a

more directly injured party; (3) that qualifies as an antitrust injury; and (4) that translates into

reasonably quantifiable damages."  *Id.* at 437-38 (citations and internal quotation marks

omitted).  Of these four, only the third is in dispute here.

Because the antitrust laws were enacted "for the protection of competition[,] not

competitors," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (internal

quotation marks omitted), the injury pleaded "should reflect the anticompetitive effect either of

the violation or of anticompetitive acts made possible by the violation," *id.* at 489.  Injury to a

plaintiff alone is insufficient; an antitrust plaintiff must also plausibly allege an injury to

---

[14] "ORMC's Mem." refers to ORMC Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Third Amended Complaint.  (Doc. 67.)  "CRHC's Mem." refers to the Memorandum of Law in Support of the Crystal Run Defendants' Motion to Dismiss the Third Amended Complaint.  (Doc. 70.)

[15] Although courts use the word "standing" in the antitrust context, "[i]t is entirely distinct from standing under Article III of the Constitution."  *Nichols v. Mahoney*, 608 F. Supp. 2d 526, 543 (S.D.N.Y. 2009); *see Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) ("[T]he doctrine of 'antitrust standing' is somewhat different from that of standing as a constitutional doctrine.").

competition – that is, "'an adverse effect on competition market-wide.'" *Ruotolo v. Fannie Mae*,

No. 09-CV-7851, 2013 WL 989740, at *7 (S.D.N.Y. Mar. 13, 2013) (quoting *Todd v. Exxon*

*Corp.*, 275 F.3d 191, 213 (2d Cir. 2001)), *aff'd mem.*, No. 13-1307 (2d Cir. June 5, 2013); *see*

*Mahmud v. Kaufmann* (*Mahmud II*), 607 F. Supp. 2d 541, 554 (S.D.N.Y.) (plaintiff must show

"injury to competition; demonstrating injury only to individual competitors is insufficient"),

*aff'd,* 358 F. App'x 229 (2d Cir. 2009).  The Second Circuit employs a three-step process to

determine whether a plaintiff has sufficiently alleged an antitrust injury:

> First, the party asserting that it has been injured by an illegal
> anticompetitive practice must identify the practice complained of
> and the reasons such a practice is or might be anticompetitive.
> Next, we identify the actual injury the plaintiff alleges. . . . Finally,
> we compare the anticompetitive effect of the specific practice at
> issue to the actual injury the plaintiff alleges.  It is not enough for
> the actual injury to be causally linked to the asserted violation.
> Rather, in order to establish antitrust injury, *the plaintiff must
> demonstrate that its injury is of the type the antitrust laws were
> intended to prevent and that flows from that which makes or might
> make defendants' acts unlawful.*

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (emphasis added)

(alterations, citations, and internal quotation marks omitted).  Thus, on a motion to dismiss, a

court should "assume that the practice at issue [as alleged in the complaint] is a violation of the

antitrust laws," *id.* at 76 n.9, and then assess whether the plaintiff has plausibly pleaded that the

result of that practice is an injury "of the type the antitrust laws were intended to prevent" –

namely, an injury to competition, *id.* at 76 (internal quotation marks omitted); *see Daniels*, 428

F.3d at 438-39.

     To plausibly plead injury to competition, as opposed to injury merely to competitors, a

plaintiff must allege facts that render plausible the conclusion that the defendant's actions caused

"adverse effects on price, quality, or output of the relevant good or service."  *N.Y. Medscan LLC*

*v. N.Y. Univ. Sch. of Med.*, 430 F. Supp. 2d 140, 146 (S.D.N.Y. 2006); *see Piccone v. Bd. of Dirs.*

*of Doctors Hosp. of Staten Island, Inc.*, No. 97-CV-8182, 2000 WL 1219391, at *3-4 (S.D.N.Y. Aug. 28, 2000) (plaintiff-doctor did not sufficiently plead antitrust injury where no allegations that plaintiff's surgery services were no longer available or that costs rose for such services); *cf. Mahmud II*, 607 F. Supp. 2d at 556 (granting summary judgment against antitrust plaintiff-doctor who failed to adduce evidence of inferior service, increase in price, or, "other than patients' inability to select plaintiff at [a particular hospital], [that] the choice of physicians in the market has changed").  Conclusory allegations of injury to competition will not suffice.  *Nichols*, 608 F. Supp. 2d at 544; *see Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 339 n.8 (1990) ("The antitrust injury requirement cannot be met by broad allegations of harm to the 'market' as an abstract entity."); *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 382 (S.D.N.Y. 2007) ("[A] conclusory statement that Xerox's conduct affected competition is insufficient to adequately plead an antitrust injury.").  Rather, a plaintiff must allege facts plausibly showing "*how* the [alleged anticompetitive activity] caused harm to competition in the market, rather than the competitors themselves."  *Nichols*, 608 F. Supp. 2d at 544 (emphasis added); *see Arista Records LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 573 (S.D.N.Y. 2007) (antitrust injury allegations sufficient to survive motion to dismiss where alleged facts plausibly demonstrate that mandatory licensing scheme injured competition generally "by reducing the ability of [peer-to-peer] retailers using hash-based filtering technology to compete effectively against other intrabrand competitors"); *see also Nat'l Ass'n of Freelance Photographers v. Associated Press* (*NAFP*), No. 97-CV-2267, 1997 WL 759456, at *10 (S.D.N.Y. Dec. 10, 1997) (on a pre-*Twombly* motion to dismiss, no antitrust injury where complaint "sets forth no factual connection between the alleged market effects and the substantive allegations" and "*no* factual allegations that would permit a finding that either of the proffered effects has actually occurred, is occurring,

or is threatened to occur") (emphasis in original); *George Haug Co. v. Rolls Royce Motorcars, Inc.*, No. 96-CV-3140, 1997 WL 563806, at *2 (S.D.N.Y. Sept. 10, 1997) (plaintiff must "plead specific facts demonstrating that the defendant's conduct injured the competitive structure of the market.") (internal quotation marks omitted).

Plaintiffs' allegations of antitrust injury here are nothing more than conclusions, devoid of factual allegations that explain "*how* the [Defendants' actions] caused harm to competition in the market, rather than the competitors themselves," *Nichols*, 608 F. Supp. 2d at 544 (emphasis added), in what way they "injured the competitive structure of the market," *George Haug Co.*, 1997 WL 563806, at *2 (internal quotation marks omitted), or the "factual connection between the alleged market effects and [Defendants' actions]," *NAFP*, 1997 WL 759456, at *10, and therefore cannot withstand *Twombly/Iqbal* scrutiny.  The allegation that patient choice is limited by the removal of one orthopedic surgeon from among an unstated number in the relevant geographical area, even one who is willing to treat those lacking insurance, is wholly conclusory and without factual basis, particularly given the relatively large geographical area (Orange County and surrounding areas including Northern New Jersey and Eastern Pennsylvania) that Plaintiffs themselves define, and the absence of facts about the choice patients have without Dr. Bhanusali available to perform certain procedures at ORMC.  *See Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1281-82 (10th Cir. 2012) (affirming summary judgment of no antitrust injury because, despite argument that "'sham peer review process' . . . harmed competition by reducing the number of physicians available to provide the type of medical services [plaintiff] typically provides," no credible evidence "that patients are denied access to cardiology services in the relevant market").  In other words, while patients' choice of doctor may be altered in some respect, absent specific facts about the service that remains in the relevant market – and there

surely are other options for patients, even those lacking insurance – it is not plausible that such choice would be so limited as to render patients in the relevant market unable to access similar services.  Indeed, even Plaintiffs do not allege that patients can no longer received the kinds of services Dr. Bhanusali provides, and thus they have not alleged injury to competition.  *See Piccone*, 2000 WL 1219391, at *4 ("Piccone does not allege that the surgery services he performed at the hospital are no longer available to its patients."); *see also Frantzides v. Northshore Univ. Healthsystem Faculty Practice Assocs.*, 787 F. Supp. 2d 725, 732 (N.D. Ill. 2011) (granting motion to dismiss because, even if allegations of conspiracy to interfere with plaintiff's business and ruin his reputation among patients were plausible, no antitrust injury where no allegations that conspiracy "resulted in any decrease in laparoscopic surgery services available to consumers").

The allegation that quality of care is limited, in that Dr. Bhanusali's current patients are forced to find new doctors and other doctors are prevented from referring patients to Dr. Bhanusali, is likewise wholly conclusory and without the requisite factual support.  Dr. Bhanusali is not alleged to be a particular specialist whose quality is so superior to anyone else's in the relevant geographical area as to render it plausible that patients are *actually* unable to receive quality care elsewhere.  *See Wagner v. Magellan Health Servs., Inc.*, 121 F. Supp. 2d 673, 681 (N.D. Ill. 2000) ("So long as these patients were treated by another qualified physician, there has only been a reduction in suppliers, not in the output of patient care.").  The conclusory allegation (unsupported by a single fact or example) that the price of orthopedic surgical services has increased by the elimination of a *single* orthopedic surgeon from the relevant market is likewise implausible, particularly given the absence of allegations of decrease in the "output of patient care" in the field of orthopedics, *see id.*, the absence of any factually-supported economic

theory, and the numerous other factors that affect the cost of medical services (not the least of which is the insurance industry), *see, e.g.*, *Melo v. Allstate Ins. Co.*, 800 F. Supp. 2d 596, 602 n.2 (D. Vt. 2011) ("[I]n the United States there is no true market value for medical services.  Third party payers negotiate substantial discounts from the rate that providers charge, and those rates are closely guarded as trade secrets.") (collecting sources).  Indeed, the Supreme Court has expressly rejected the theory that "removal of some elements of price competition [necessarily] distorts the markets, and harms all the participants," because such a theory would "equate injury in fact with antitrust injury."  *Atl. Richfield Co.*, 495 U.S. at 339 n.8 (internal quotation marks omitted) ("[N]ot every loss stemming from a violation counts as antitrust injury").  And, the alleged "chilling on competition" because of "fear of retaliation through [the] Sham Peer Review," (TAC ¶ 237), again unsupported by facts, is merely a conclusory statement of harm to competition that is insufficient to plausibly allege an antitrust injury, *see Atl. Richfield Co.*, 495 U.S. at 339 n.8.

In short, Plaintiffs have failed to plausibly allege antitrust injury because they have failed to allege the requisite factual connection between the "alleged market effects and the substantive allegations."  *NAFP*, 1997 WL 759456, at *10.  At best, "[e]ven if [D]efendants' conduct was designed to drive [Dr. Bhanusali] out of the relevant market, . . . the only injury alleged in the [TAC] is injury to [P]laintiffs' business."  *Naso v. Park*, 850 F. Supp. 264, 271 (S.D.N.Y. 1994). Accordingly, Plaintiffs have no antitrust standing, and their federal antitrust claim (Sixth Cause of Action) must be dismissed.[16]

---

[16] Even if Plaintiffs had plausibly alleged antitrust standing, which they have not, I would likely still dismiss their federal antitrust claim because they have failed to plausibly state a claim for relief under Section 1 of the Sherman Act.  To state a Section 1 antitrust claim, a plaintiff must plead "enough factual matter (taken as true) to suggest that an agreement was made" – that is, "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  *Twombly*, 550 U.S. at 556.  A "naked assertion of conspiracy . . . without some further factual enhancement . . . stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* at 557 (alteration and internal quotation marks omitted).  The TAC is devoid of factual allegations that would plausibly

D.  *Leave to Amend*

Leave to amend a complaint should be freely given "when justice so requires."  Fed. R.

Civ. P. 15(a)(2).  It is "within the sound discretion of the district court to grant or deny leave to

amend."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  "Leave to

amend, though liberally granted, may properly be denied for:  'undue delay, bad faith or dilatory

motive on the part of the movant, repeated failure to cure deficiencies by amendments previously

allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility

of amendment, etc.'"  *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman

v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiffs have amended their pleading three times.  The first was before the first Motion

to Dismiss, with notice as to potential defects discussed at a pre-motion conference held on

March 1, 2011.  The second was after I rendered my Decision on the first Motion to Dismiss,

specifically identifying actual defects and giving advice on their resolution.  The third was before

the instant Motions to Dismiss, with notice as to additional potential defects discussed at a pre-

motion conference held on April 5, 2012.  Plaintiffs' failure to fix deficiencies in their previous

pleadings, after being provided full notice of the deficiencies, is alone sufficient ground to deny

leave to amend *sua sponte*.  *See In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222,

242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities

to cure the defects in their complaints, including a procedure through which the plaintiffs were

provided notice of defects in the Consolidated Amended Complaint by the defendants and given

---

support the existence of an agreement among the Defendants to oust Dr. Bhanusali from the market.  Plaintiffs
baldly assert conspiracy, (*see* TAC ¶¶ 233-36), supplementing these allegations only with generalized facts of a
connection between ORMC and CRHC, (*id.* ¶¶ 63-72) – some of which are merely on information and belief, (*id.* ¶¶
64-65, 69-72) – that do not plausibly suggest collusion with respect to driving Dr. Bhanusali out of business.
Without any other facts, the TAC "stops short of the line between possibility and plausibility of entitlement to
relief."  *Twombly*, 550 U.S. at 557 (alteration and internal quotation marks omitted).

a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (internal quotation marks omitted); *see also Ruotolo*, 514 F.3d at 191 (affirming denial of leave to amend "given the previous opportunities to amend").  Further, Plaintiffs have not requested leave to file a Fourth Amended Complaint or suggested that they are in possession of facts that would cure the deficiencies identified in this opinion.  Indeed, their failure to include additional facts in the TAC sufficient to address the discrimination claims, after the issues were identified in my previous ruling, suggests they are not in possession of any such facts.  Accordingly, I decline to grant Plaintiffs leave to amend *sua sponte*.

## III.   CONCLUSION

For the foregoing reasons, both the ORMC Defendants' Motion to Dismiss, (Doc. 65), and the CRHC Defendants' Motion to Dismiss, (Doc. 68), are hereby GRANTED.  The Clerk of Court is directed to terminate the pending Motions, (Docs. 65, 68), and close the case.

**SO ORDERED.**

Dated: August 12, 2013
          White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.